## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 21-20604-CR-GAYLES/TORRES

UNITED STATES OF AMERICA,

     Plaintiff,

v.

ALEX WESTBROOK,

     Defendant.

_____/

## REPORT AND RECOMMENDATION
## ON DEFENDANT'S MOTIONS TO SUPPRESS
## PHYSICAL EVIDENCE AND STATEMENTS

This matter is before the court on Defendant's Motion to Suppress Physical Evidence and Statements pursuant to Fed. R. Crim. P. 12(b)(3)(C) and the Fourth Amendment of the United States Constitution. [D.E. 23]. A hearing was held on July 7, 2022. The Court reviewed the motion and its response, [D.E. 30], weighed the evidence presented at the hearing, and considered the legal arguments of counsel. As more fully explained below, police officers had probable cause to stop and search the vehicle in which Defendant was a driver. Thus, this Court concludes that Defendant's motion to suppress should be **DENIED**.[1]

---

[1] This motion was referred by the Honorable Darrin P. Gayles for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and the Magistrate Rules of the Local Rules of the Southern District of Florida. [D.E. 26].

## I.   FINDINGS OF FACT

The record and evidence presented at the evidentiary hearing provide the bases for the following findings of fact that are material to the issues raised, as well as any findings that may be found in the analysis section of this Report. Defendant Alex Westbrook ("Defendant") is charged in a multicount indictment, including one count of Hobbs Act robbery under 18 U.S.C. § 1951(a), one count of brandishing a firearm in furtherance of a crime of violence under 18 U.S.C. § 924(c)(l)(A)(ii), and one count of possession of a firearm and ammunition by a convicted felon under 18 U.S.C. § 922(g)(1). [D.E. 6]. Defendant seeks to suppress all physical evidence seized during and after a October 30, 2021 vehicle stop and subsequent arrest, including a firearm and ski mask found in the vehicle that link the Defendant to the robbery. Furthermore, Defendant seeks suppression of all statements made after the October 30 stop.

These charges arise from the October 27, 2021, robbery of a McDonald's restaurant in Hialeah. Detective Azael Acay testified that the robbery occurred at around 5:30 AM and that he arrived on the scene shortly after. The store employees informed Detective Acay that the robber, an African American male, had entered through the rear of the restaurant when an employee opened the door to dispose of garbage. The employees described the robber as a "short, black" male with a "stocky build." The robber was also dressed in dark clothing, wore a ski mask covering his face and neck area, and was armed with a black handgun crafted with distinctive

"ridges." After stealing $3,000 from the restaurant safe and cash registers, the robber exited the restaurant and entered a getaway vehicle.

Although the restaurant lacked security footage, law enforcement reviewed neighboring establishments' CCTV surveillance footage to identify the robber's vehicle. Law enforcement identified a suspicious silver Mitsubishi Outlander with malfunctioning taillights that had circled the restaurant multiple times before the robbery and was caught leaving the area shortly after the theft. After pulling the license plate information, law enforcement determined that Enterprise Rent-A-Car owned the Mitsubishi. Upon speaking with Enterprise and retrieving rental records for that vehicle, law enforcement learned that Chauntel Walters, Defendant's girlfriend, had rented the Mitsubishi.

Importantly, Walters had returned the Mitsubishi on the afternoon of October 27, 2021, the same day as the initial McDonald's robbery. Enterprise informed Detective Acay that Walters exchanged the Mitsubishi for a black Chrysler Voyager because the Mitsubishi's "rear lights weren't working." Exh. 3, 4. In addition, Walters exchanged the rental vehicles accompanied by a "short black male" with dreads, whom Detective Acay identified as Defendant.

Law enforcement then conducted an interior and exterior search of the Mitsubishi, which uncovered fingerprints on the rear driver's door that matched the Defendant. From this information, law enforcement learned that Defendant was on supervised release at the time for a prior Hobbs Act felony. Detective Acay further testified that City of Hialeah law enforcement entered the Chrysler's plate

3

information into a license plate reader ("LPR")[2] to receive notifications of the Chrysler entering and exiting Hialeah.

In the early morning hours of October 30, 2021, three days after the McDonald's robbery, law enforcement was alerted by the LPR system that the Chrysler returned to Hialeah. Specifically, the system notified the officers that the vehicle was spotted at NW 103rd street at approximately 4:30 a.m., which was significant to the officers because that was a similar time in the morning as the October 27 robbery.

Several officers and detectives in multiple vehicles responded to the area based on the notification. They observed the Chrysler they were looking for circling another Hialeah McDonald's near West 49th Street. Defendant was seen driving the Chrysler with Walters in the passenger seat. Detective Acay testified that at one point during this near twenty-minute "casing of the property," Defendant parked the Chrysler, opened the hood, and stepped out of the vehicle. Defendant was "10" to "20" yards from the McDonald's rear door, but the door never opened. During this time, Defendant approached the Chrysler's hood, opened it, waited and stood there for some time, then closed the hood and returned to the vehicle. The vehicle then continued circling the area.

After Defendant ceased circling the McDonalds, he drove to a nearby the Dunkin Donuts only several miles down the road. Defendant then began circling the

_____

[2] LPR is a camera system that analyzes specified license plates to locate vehicles through different areas. City of Hialeah law enforcement used the LPR system extensively in the investigation and subsequent arrest of Defendant.

Dunkin Donuts for another twenty-minute period, just as he had at the McDonald's. Notably, although both establishments are open 24 hours, at no time did Defendant enter either drive-thru to make a purchase. Instead, the officers concluded that they were circling the businesses in a way that could only be an effort to case them in order to conduct another robbery.

After the vehicle engaged in this "casing" activity for about one hour, Defendant and Walters seemed to be leaving the area in the Chrysler. Considering the totality of the circumstances they observed that night, together with the known information tying the Defendant to the vehicle that was used in the October 27 robbery, law enforcement decided to stop the Chrysler and seize the Defendant. Because they believed there was cause to suspect he was carrying a firearm used in the October 27 McDonald's robbery, the officers decided to not just conduct a routine traffic stop. Rather, they chose to use a total vehicular containment (TVC) technique, which tasked unidentified police vehicles with boxing in Defendant's Chrysler and crashing into the vehicle to force a complete stop and prevent an escape.[3] Defendant and the passenger were then forced out of the vehicle with the officers' weapons drawn. The ski mask was seen in the front seat area but no weapon was observed. Defendant was dressed in dark clothing and had black stockings over his "distinct" shoes as if to cover the identity of the shoes. Exh. 19.

---

[3] Def. Exh. B (illustrating damage to Chrysler and police vehicles after completion of the TVC stop).

At that point, the officers called for a K-9 officer to go to the scene to help determine if a weapon was in the vehicle. Detective Kenneth Wilcox arrived at the scene to conduct a firearm search of the Chrysler with the assistance of his trained canine. Detective Wilcox and his canine partner searched the inside and outside of the car for firearms. As the canine was outside the vehicle near the hood, he alerted to the presence of a weapon. Officers opened the hood and uncovered a dark handgun with distinctive "ridges" on the car battery. *See* Exh. 13, 16–18.[4] The total search lasted no more than twenty minutes. Defendant was subsequently arrested and charged with the counts mentioned above.

## II.    ANALYSIS

Defendant seeks to suppress all evidence acquired during the October 30 stop because they contend that law enforcement did not have "reasonable suspicion" to conduct a valid *Terry* stop. In response, the United States argues that law enforcement had reasonable suspicion and, at least, probable cause to stop and search the car without a warrant. Thus the Court must determine first whether law enforcement conducted a valid *Terry* stop or, alternatively, whether law enforcement had probable cause to stop and search Defendant's vehicle without a warrant.

---

[4] After receiving Enterprise's approval to search the Chrysler, officers confirmed that a black ski mask was sitting on the driver's side front seat. See Exh. 11, 20.

6

**A.      The Hialeah Officers Did Not Conduct a Valid *Terry* Stop Because the TVC Was Overly Intrusive and Beyond the Scope of <u>an Ordinary *Terry* Stop.</u>**

Considering the totality of the circumstances, law enforcement did not conduct a valid *Terry* stop, contrary to the government's first argument in opposition to the motion to suppress. "The Fourth Amendment prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). Thus, "stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of the [Fourth and Fourteenth] Amendments, even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Where law enforcement officers are not acting for a special purpose, such as patrolling the borders or roadway safety, it is unreasonable under the Fourth Amendment to stop a vehicle and detain its driver to check their license and registration unless the officers have at least articulable and reasonable suspicion that the driver is not licensed, that the automobile is not registered, or that one of its occupants is otherwise subject to seizure for a violation of the law. *Id.* at 663.

In *Terry*, the Supreme Court adopted a two-part inquiry in evaluating the "reasonableness of an investigative stop." *United States v. Sharpe*, 470 U.S. 675, 682 (1985) (citing *Terry*, 392 U.S. at 20). The first inquiry is whether the "officers had a reasonable suspicion that the defendant had engaged, or was about to engage, in a crime." *United States v. Acosta*, 363 F.3d 1141, 1144 (11th Cir. 2004) (citing *United*

*States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000)). "In the second part of the inquiry, determining whether the stop went too far and matured into arrest before there was probable cause, we consider ' "whether [the stop] was reasonably related in scope to the circumstances which justified the interference in the first place." ' " *Acosta*, 363 F.3d at 1145 (quoting *Powell*, 222 F.3d at 917 (quoting *Terry*, 392 U.S. at 20)). "Furthermore, '[w]hile "reasonable suspicion" is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop.'" *Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 120 (2000) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989))). "[A] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." *Acosta*, 363 F.3d at 1145 (quoting *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000)).

*Acosta* further analyzed the second part of the *Terry* inquiry by distinguishing "an investigative stop of limited duration for which reasonable suspicion is enough, and a detention that amounts to an arrest for which probable cause is required." *Acosta*, 363 F.3d at 1145–46. "To assist us in more objectively drawing the line between a Terry stop and an arrest in an individual case, we apply four non-exclusive factors:" 1) law enforcement purpose served by the detention, 2) the diligence with which the police pursued the investigation, 3) the scope and intrusiveness of the detention, and 4) the duration of the detention. *Id.* at 1146. In analyzing the first factor, the Eleventh Circuit explains "[a] Terry stop is justified to give the police an

opportunity to engage in brief and *nonintrusive* investigation techniques . . . [it] cannot be used as the basis of a 'full search' that would normally be warranted only by the existence of probable cause, consent, or a valid arrest." *United States v. Hardy*, 855 F.2d 753, 759 (11th Cir. 1988) (emphasis added). Under the second factor, a court must consider "whether the methods the police used were carried out without unnecessary delay." *Acosta*, 363 F.3d at 1146 (citing *Sharpe*, 470 U.S. at 686–87).

In determining whether the third factor was met, *Acosta* acknowledged that officers may take reasonable steps to ensure their safety so long as they possess "an articulable and objectively reasonable belief that the suspect is potentially dangerous." 363 F.3d at 1146 (quoting *Michigan v. Long*, 463 U.S. 1032, 1051 (1983)). Ultimately, *Acosta* found that the officers there were justified in drawing their weapons and frisking the defendant for reasonable suspicion that the defendant was carrying a weapon. 363 F.3d at 1146. *See also United States v. Roper*, 702 F.2d 984, 987–88 (11th Cir. 1983) (drawing a weapon was not overly intrusive for determining whether a situation was a *Terry* stop); *United States v. Hastamorir*, 881 F.2d 1551, 1557 (11th Cir. 1989) (handcuffing a suspect was not overly intrusive for determining whether the situation was a *Terry* stop); *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000) (handcuffing and placing the defendant in the back of the patrol car was a reasonable yet "severe form of intrusion" necessary considering the totality of the circumstances).

Finally, to analyze the fourth factor, "[t]here is no rigid time limitation or bright line rule regarding the permissible duration of a Terry stop." *Acosta*, 363 F.3d at 1147 (concluding a thirty-minute stop was a reasonable duration).

In our case, law enforcement undoubtedly had reasonable suspicion to conduct an investigatory stop of the Defendant's vehicle based on the information gathered at that point. Although Defendant had not been observed committing any illegal activity during the officers' surveillance, law enforcement knew that they had identified Defendant's fingerprints on the Mitsubishi connected to the October 27 Hobbs Act robbery of the Hialeah McDonalds. After pulling his fingerprints, law enforcement understood Defendant was out on parole for a similar crime committed years prior. On top of that, law enforcement identified, tagged, and followed a rented Chrysler on October 30 for suspicious behavior reminiscent of the October 27 McDonald's robbery. Considering that the standard for reasonable suspicion is less than a preponderance of the evidence, law enforcement indisputably had reasonable suspicion to conduct this stop.

Nonetheless, that is only the first stage of the process. We must still determine whether the stop fell within the bounds of an "investigative stop of limited duration" or whether this was a detention that amounted to an arrest that would be unreasonable and unlawful absent probable cause. Here, although most of the four factors are met,[5] law enforcement did not execute the stop within the limited scope

---

[5] Law enforcement conducted the stop after several days and one night of relevant investigation, showing reasonable suspicion, and conducted the stop within a relatively short period of time (the time it took to stop and search Defendant was no

and intrusiveness permitted in a typical *Terry* stop. Instead, law enforcement conducted a TVC, which caused them to force Defendant's vehicle to a complete stop. And significantly, dangerous force was used in that process given that one of the officer's vehicles crashed into the left rear of the Defendant's vehicle.  Although this seizure was carried out with vehicles, this situation would be the equivalent of law enforcement aggressively using physical force to immobilize a suspect to then conduct a search of his person and effects.  That is a classic "arrest" for Fourth Amendment purposes.  *See, e.g., Kaupp v. Texas*, 538 U.S. 626, 629 (2003) ("A seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, 'taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'") (quoting *Florida v. Bostick,* 501 U.S. 429, 437 (1991) and *Michigan v. Chesternut,* 486 U.S. 567, 569 (1988)).

For instance, in the Eleventh Circuit cases of *Roper*, *Gil*, *Acosta*, and *Hastamorir* that we cited above, law enforcement used traditional non-forceful means to pull over or approach the suspects. *See Acosta*, 363 F.3d at 1143 (traditional stop)*; Gil*, 204 F.3d at 1349 (traditional stop); *Roper*, 702 F.2d at 985 (traditional stop, but officer approached with gun drawn); *Hastamorir*, 881 F.2d at 1153 (law enforcement approached in a parking lot after witnessing suspicious exchange). Our facts present a very different picture.  Law enforcement in this case used significant force to compel

---

more than thirty minutes). Therefore, law enforcement likely met the first, second, and fourth factors of the *Terry* stop test.

the Defendant to stop and, as Detective Acay testified, to prevent an escape and high-speed chase. The TVC caused substantial damage to both law enforcement and Defendant's rental vehicle, thus proving the intrusive nature of this stop. Therefore, the manner and intensity at which law enforcement conducted this stop put the search and seizure outside the scope of a *Terry* stop for not meeting the third factor. *See, e.g., United States v. Virden*, 488 F.3d 1317, 1321 (11th Cir. 2007) ("The seizure here was unreasonable absent probable cause because of its scope and intrusiveness. While not unduly lengthy, the seizure was accomplished by the taking of [defendant's] vehicle to a new location for the purposes of investigation. We have frowned upon the movement of individuals for such purposes. . . . Furthermore, to effectuate this seizure the officers handcuffed [defendant], and without formally arresting him, drove him to another location. Such a seizure exceeds the boundaries of a *Terry* stop.") (citing in part *Hayes v. Florida,* 470 U.S. 811, 816 (1985) ("[O]ur view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes.")).

So, in sum, in our case we have a seizure of a type and intensity that does not fall within the *Terry* umbrella. Admittedly, the Supreme Court has recognized that even a limited investigatory stop can be deemed a seizure under the Fourth Amendment, even though it is reasonable and may include a frisk for weapons if suspicion exists that the officer is in danger. *Terry,* 392 U.S. at 19 ("We therefore

reject the notions that the Fourth Amendment does not come into play at all as a limitation upon police conduct if the officers stop short of something called a 'technical arrest' or a 'full-blown search.' "). But when the level of force or intrusiveness utilized far exceeds that limited scope, and includes potential deadly force or such force that is designed to immobilize an individual, then the seizure is tantamount to an arrest and requires greater Fourth amendment scrutiny. *Cf. Torres v. Madrid*, 141 S. Ct. 989, 998 (2021) (holding that use of deadly force constituted a Fourth amendment seizure immediately upon its use whether or not the individual was actually subdued) ("While a mere touch can be enough for a seizure, the amount of force remains pertinent in assessing the objective intent to restrain."); *Kaupp v. Texas*, 538 U.S. at 631 (holding that arrest was effectuated, not an investigatory stop, when a "17–year-old boy was awakened in his bedroom at three in the morning by at least three police officers, one of whom stated 'we need to go and talk.' He was taken out in handcuffs, without shoes, dressed only in his underwear in January, placed in a patrol car, driven to the scene of a crime and then to the sheriff's offices, where he was taken into an interrogation room and questioned").

We should note that there are other commonly used techniques that law enforcement could have used to execute a traditional traffic stop and satisfy the *Terry* factors. And officers could have used reasonable methods to protect themselves in the process. But those methods must still revolve around an investigatory stop as opposed to a full-scale arrest. *See, e.g., United States v. Lester*, 477 F. App'x 697, 701 (11th Cir. 2012) ("Under Florida law, when a defendant resists detention during

a *Terry* stop by struggling with the officer, the officer is justified in arresting the defendant for resisting an officer without violence. Fla. Stat. § 843.02 (2010); *Jacobson v. State,* 476 So.2d 1282, 1287 (Fla. 1985) (physically restraining someone seeking to escape a legal *Terry* stop is the lawful execution of a legal duty, and resistance violates § 843.02).").

If officers choose instead to forego that procedure and conduct a full-scale arrest at the inception of the seizure with the level of force used here, then they must have probable cause to do so.  We turn, then, to that question to determine if the motion to suppress may be denied on that alternative basis.  If probable cause did not exist based on what the officers knew before they arrested the Defendant in his vehicle, then this full-scale arrest would have to be deemed unlawful.

### B.   The Officers Had Probable Cause to Search and Seize Defendant's Vehicle Under the Totality of the Circumstances.

Despite not meeting the requirements for a valid *Terry* stop, law enforcement had probable cause to arrest Defendant and search Defendant's vehicle without a warrant. A search conducted without a warrant issued upon probable cause is per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions. *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). The three recognized exceptions to the warrant requirement are a search incident to a lawful arrest*, see, e.g.*, *New York, v. Belton*, 453 U.S. 454 (1981); an inventory search, *see, e.g.*, *South Dakota v. Opperman*, 428 U.S. 364 (1976); and a search permissible under the

14

automobile exception, *see, e.g.*, *United States v. Watts*, 329 F.3d 1282 (11th Cir. 2003). The third exception applies to the facts of this case.

"The automobile exception to the warrant requirement was based initially on a car's ready mobility and the exigent circumstances created by that mobility." *Watts*, 329 F.3d at 1284 (citing *Carroll v. United States*, 267 U.S. 132, 153 (1925)). In *California v. Carney*, 471 U.S. 386, 391-92 (1985), however, the Supreme Court articulated an additional justification for warrantless car searches; namely that a car's occupants enjoy a reduced expectation of privacy in their car compared to their home due to the extensive regulation of automobiles. Thus, the automobile exception allows police officers to conduct a warrantless search of a vehicle where they have probable cause to believe it contains illegal drugs or other contraband. *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) ("if a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment ... permits police to search the vehicle without more."); *Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (raising the same argument in *Labron*); *see also United States v. Ross*, 456 U.S. 798, 809 (1982) ("a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained.").

A related concept is that officers, armed with probable cause, may conduct outside one's home a warrantless arrest of a suspect believed to have committed a crime. *See, e.g., United States v. Watson*, 423 U.S. 411, 417 (1976) ("The usual rule is that a police officer may arrest without warrant one believed by the officer upon reasonable cause to have been guilty of a felony . . . .") (quoting *Carroll,* 267 U.S. at

156). A common public place for warrantless arrests in the modern world is found inside one's automobile. *See, e.g., Arizona v. Gant*, 556 U.S. 332, 343 (2009) ("we also conclude that circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.' "). And when a felony suspect is found in his vehicle, then "the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein." *Id.* at 344 (citing *New York v. Belton,* 453 U.S. 454 (1981) and *Thornton v. United States,* 541 U.S. 615 (2004)).

As one can imagine, these two Fourth Amendment principles frequently converge. And they both squarely apply in our case, as illustrated by the Eleventh Circuit's decision in *United States v. Street*. In that case the court affirmed a district court's denial of a motion to suppress because the "facts and circumstances" of the case led the officers to believe the defendant had committed an offense that justified a warrantless arrest and search of a vehicle. *United States v. Street*, 472 F.3d 1298 (11th Cir. 2006). This case involved a 2004 Georgia bank robbery where a citizen followed the suspect, driving a gray car, to communicate the license plate number to a 911 operator. *Id.* at 1302. Law enforcement ran the plate number and learned the car was rented by the defendant, a twenty-two-year Georgia police officer. *Id.* As a result of this finding, federal and state officials set up surveillance in the defendant's neighborhood the same afternoon of the robbery. After doing so, they observed the defendant in the area and initiated a routine traffic stop. *Id.* Law enforcement

informed the defendant he was not under arrest, but they wished to discuss the rental car on the road or at the defendant's home. *Id.* at 1302–03.

Law enforcement then traveled to the defendant's home to question him about his activities earlier that day. *Id.* at 1303. The defendant gave an inconsistent narrative as to the rental of the car and his actions that day. *Id.* The defendant then consented to a search of the rental car and his bedroom. *Id.* Law enforcement found more incriminating information, including a loaded handgun clip in the rental car, which the defendant claimed to have lost months before, and the defendant's radio tuned to the same zone where the bank robbery occurred. *Id.* In response to further questioning and apparent inconsistencies, the defendant confessed to the morning's robbery and two others. *Id.* Despite the defendant's attempt to suppress the confessions and the evidence, the district court found that the investigation and ensuing confessions followed a valid *Terry* stop based on reasonable suspicion, and significantly for our purposes, alternatively held that law enforcement were armed with probable cause before he confessed to justify a warrantless arrest of the defendant. *Id.* at 1304–05.

The crux of that alternative holding was that probable cause "is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed . . . an offense." *Id.* at 1305 (quoting *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998)). Considering the totality of the circumstances, the Eleventh Circuit affirmed the district court's finding

that probable cause existed in that record to justify an arrest. *Id.* at 1305. The court relied on the record evidencing that an eyewitness to the robbery identified the license plate number, the defendant renting a car with the same physical description and license plate number, the defendant providing inconsistent answers to questions, and the defendant matching the description of the man who had committed the robberies. This totality of evidence, known to the officers before the seizure, all established probable cause. *Id.*

The facts in our case even more strongly support a probable cause finding that justified the seizure of the Defendant's vehicle to execute a search of its contents for incriminating evidence, as well as the warrantless arrest of the Defendant driving the vehicle. Like the *Street* case, law enforcement had substantial, incriminating evidence tying Defendant to the October 27 robbery. Officers had seen video surveillance evidencing a suspicious Mitsubishi "casing" or circling the area where the McDonald's robbery took place.  That vehicle quickly left the area after the robbery.  The video showed that it had non-working taillights.  The video also provided enough detail from which a license plate search could be conducted.  That then led to identification of the Mitsubishi as a rental vehicle from Enterprise Rental, which also just happened to have been returned by the renters for broken taillights.

Following a consensual search of the vehicle and a fingerprint scan of the returned Mitsubishi, law enforcement then identified Defendant's prints.  That then showed them that this individual was also on supervised release for a prior Hobbs Act robbery, and who also matched the initial robber's physical descriptions: short,

African American, and stocky. This evidence is tantamount to or even stronger than the evidence considered in *Street* as a basis for finding probable cause that more probably than not tied Defendant to the initial McDonald's robbery.

But wait, there is more.  Even if one concludes that, at most, what officers knew before October 30 merely provided a reason to suspect the Defendant's complicity, as opposed to amounting to probable cause itself, the investigating officers did not immediately arrest the Defendant even after surveilling him for some time after they learned of the new rental vehicle.  Though it is arguable whether they possessed probable cause at that point, further surveillance closed the probable cause loop.  Armed with the license plate for the second vehicle, the Chrysler minivan, officers decided to tag the Chrysler to confirm their suspicions. As it turns out, the Chrysler, with Defendant as the driver, turned back up at 4:30 in the morning in the same Hialeah commercial area.  Officers dispatched to follow the vehicle then witnessed the same suspicious circling pattern that occurred before the initial McDonald's robbery three days earlier.  This circling pattern did not happen a mere several times but lasted for about an hour before law enforcement concluded that they had probable cause to seize the vehicle before it departed the municipality.  That highly suspicious activity, at that time of night, was then amplified when officers witnessed the Defendant exit the vehicle near a separate McDonald's, open the hood, and wait.  That further evidenced, to a reasonable objective police officer, that the occupants of that vehicle were probably aiming to rob the restaurant, if presented the opportunity, just like the October 27 robbery.

So now that earlier strong suspicion was confirmed, to the degree of probability, when this same Defendant engaged in the predatory circling of these businesses at that time of night.  When you combine what they learned after the October 27 robbery with what they personally observed on October 30, a reasonable police officer could readily conclude that the occupants of that Chrysler mini-van probably committed the first robbery and, further, engaged in an active conspiracy to commit another robbery.

Therefore, the officers were correct in their collective conclusion that morning that probable cause existed to arrest the occupants of the vehicle and/or search the vehicle for evidence of the robbery likely to be found inside.  Certainly, had they requested a warrant to conduct their operation, a warrant would have issued.  *See, e.g., United States v. Patterson*, 877 F.3d 419, 428 (1st Cir. 2017) (affirming denial of motion to suppress; "The record shows that law enforcement had watched Patterson "case" various banks in the area for nearly two weeks prior to his arrest, had noted the similarities between Patterson's car and the car seen at the previous robberies, and, just before the arrest, had watched him change into clothes consistent with the type of clothing worn by the robbers in the previous string of bank robberies: sunglasses, gloves, and head and face coverings"); *United States v. Williams*, 10 F.3d 1070, 1075–76 (4th Cir. 1993) (" 'A combination of tips from an informant and first-hand corroborative observation of suspicious activity will provide probable cause for an arrest.' Officer Catherwood's first-hand observations combined with eyewitness reports from previous robberies and the corroborative tip from Ruth Kossler provided

the officers with probable cause to make the arrest.") (citation omitted); *United States v. Baldwin*, 644 F.2d 381, 384 (5th Cir. 1981) (warrantless arrest supported by probable cause where "Baldwin's truck was positively identified by a witness as the getaway vehicle. Moreover, the clerks at Olney Savings had given police officers a description of the robbers and two suspicious acting men who had stopped in the savings association the Friday previous to the robbery, one of which Baldwin fit generally."); *United States v. Barnett*, 423 F.2d 694, 694 (9th Cir. 1970) (finding probable cause existed where defendant matched physical description of the robber and his name and address matched that of the tag on the getaway car).

We know of course that a warrant was not required given that the Defendant was arrested in a public space and inside a moving vehicle. That warrantless arrest was fully supported by probable cause to justify law enforcement's forceful seizure and subsequent search of Defendant's rented Chrysler. The information ascertained after the stop, including a firearm that matched the description of the initial McDonald's robbery, and Defendant's suspicious dark clothing, only bolsters the case for probable cause, but cause clearly already existed before that evidence was found. So that later evidence was properly seized incident to Defendant's arrest and in the execution of a valid search of a vehicle based on probable cause gathered, in part, from the K-9 sniff. Accordingly, Defendant's motion to suppress evidence should be denied.

### III.   CONCLUSION

Based upon a thorough review of the record as a whole and the credible evidence admitted at the evidentiary hearing, the undersigned **RECOMMENDS** that Defendant Alex Westbrook's Motion to Suppress [D.E. 23] be **DENIED**.

Written objections to this Report and Recommendation, if any, shall be expeditiously filed. Given the fact that this case is set for trial starting the week of August 1, 2022, the Court will expedite the period for filing objections as per S.D. Fla. Local Mag. J. R. 4(b). Any objections must be filed by July 20, 2022.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein. *R.T.C. v. Hallmark Builders, Inc.*, 996 F. 2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F. 2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F. 2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** at Miami, Florida, this 15th day of July, 2022.


   */s/ Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge